MAMMOTH SPRINGS ROLLER MILL COMPANY *v.* COOK.

Opinion delivered January 5, 1901.

CONTRACT—TERMINATION.—Appellant employed appellee as manager of its mill at a stated salary, and sold him a certain number of shares of its stock, agreeing to repurchase them at the end of twelve months, if his services were not satisfactory. At the end of twelve months appellee continued to act as manager for two months, when a new contract was entered into wherein it was provided that the same salary should be paid to appellee as manager, and that, if dissatisfied with his services, appellant should give thirty days' notice of a termination of the contract. Subsequently upon due notice appellant terminated the contract. *Held,* that the original contract was no longer in force, and that under the second contract appellant was not bound to repurchase appellee's stock. (Page 571.)

Appeal from Fulton Circuit Court in Chancery.

JOHN B. McCALEB, Judge.

*John W. Meeks* and *Sam H. Davidson*, for appellant.

The original contract was not such as to bind appellant to purchase appellee's stock at market price when the office of general manager was discontinued. The action of the board on Sept. 8, 1895, put an end to such a contract, if it ever existed. In construing a contract made between a corporation and its officers, whereby a corporate liability is created in favor of the officer, that construction should be adopted which is most favorable to the corporation. 20 S. W. 379. Appellant,

having no charter authority to do so, cannot purchase its own stock. 1 Morawetz, Corp. §§ 7 and 8; Saud. & H. Dig. § 1328; Aug. & A., Corp. 600; Thompson, Liability of Stockholders § 13; 19 Kan. 65. Indeed, such a contract is against public policy and unenforcable, on general principles. 6 Ill. App. 258; Aug. & A., Corp. § 600, p. 640; Morawetz, Corp. § 112, p. 109; 35 Ohio St. 263; 38 Ohio St. 278; 32 S. W. 267; 54 Ark. 567.

Appellee, *pro se.*

Oral evidence was inadmissible to vary the original contract, its meaning being clear. Smith, Cont. 97, 98, 99, §§ 34 and 36; 2 Pars. Cont. 36–40. A contract will be read and construed as a whole, in the light of the circumstances and their relation to the subject-matter. 20 So. 81. The contemporaneous construction of the parties will govern. 71 N. W. 1019. A formal rescission was not necessary. 37 Mich. 576. Nor was any tender of the stock. 26 Mich. 453, 454; 13 R. I. 483.

BUNN, C. J. This was originally a suit at law for the recovery of the sum of $7000 and interest, from the appellant company by the appellee, on a breach of contract alleged to have been entered into between them on the 8th of September, 1894. The cause was transferred to the equity docket, and on final hearing, upon the pleadings, testimony and argument of counsel, on the 31st day of August, 1898, it being a day of the Fulton circuit court, it was decreed that the plaintiff, the said W. D. Cook, do have and recover of the defendant, the Mammoth Springs Roller Mill Company, the sum of $5923.75, with 6 per cent. per annum interest and his costs. From this decree the defendant duly and in due time appealed to this court.

This litigation grows out of the following state of facts, to-wit: The appellant is a corporation, organized and doing business at Mammoth Springs, Fulton county, and at a special meeting of its board of directors, on the 8th day of September, 1894, a proposition was made in writing to said board by the appellee, W. D. Cook, of which the following is a copy, viz.: "To G. C. Buford, President Mammoth Springs Roller Mill Com-

pany:  Dear Sir—I make the following proposition: First. I will buy $7000 treasury stock of the Mammoth Springs Roller Mill Company at 75 cents on the dollar. I will take charge of the mill at a fixed salary of $2000 per year, this salary to come out of the first earnings of the mill. After this salary is charged to the mill, then a dividend of six per cent. is to be paid out of the net earnings on the entire issue of capital stock outstanding. If the net earnings are sufficient to pay the dividend—leave a surplus above the dividend—then I am to receive an additional amount of $1500; then the remainder of all net earnings is to be declared on all outstanding stock *pro rata*; the company aiding me with credits and endorsements to furnish the working capital to run the mill. And the company agrees to take the $7000 stock from W. D. Cook at the market price at the expiration of twelve months, provided his services should not be satisfactory to the company.  [Signed]  W. D. Cook."

The meaning of the proposition is:  The proponent would engage to manage the operations of the mill of defendant, and at once purchase from it $7000 of its stock at 75 cents on the dollar, amounting to $5250.  He was to receive $2000 per annum as a fixed salary, and this fixed salary was to be paid out of the first earnings of the mill.  This $2000 fixed salary was, then, a preferred claim to all others, and to be paid before a balance was struck upon which a dividend might be declared. After this fixed amount of $2000 should be charged to the milling company, then the net earnings should be ascertained, and a dividend of 6 per cent. should be declared thereon, and paid out on all the outstanding stock.  If these net earnings should be sufficient to pay the dividend aforesaid—6 per cent on the capital stock outstanding—then out of the same the proponent, as such manager, should be paid for the year an additional $1500.  After that the remainder of the net earnings should be divided on all outstanding stock *pro rata*.  The company, by its credit and indorsement, should enable him to procure funds for the running expenses of the mill.  At the expiration of twelve months, if the services of the proponent should not be satisfactory to the company, the latter should repurchase the $7000 of stock he purchased from it in the outset at the

then market price.  This proposition was accepted by the board of directors of the milling company then and there, and both parties at once entered upon the work of carrying it out as a contract between them, the appellee taking charge of the mill as the company's secretary and manager, and drawing his salary from that date according to the terms of the contract, and until 8th September, 1895, amounting to the sum of $3500.

At the regular annual meeting of the board of directors of the milling company held in June, 1895, appellee was elected secretary and manager for the ensuing year, but the amount of salary he was to receive was not then mentioned.  On the 8th September, 1895, the first year of the appellee's employment as secretary and manager expired, he having been in June previously, however, elected for a second year as stated.  The appellee continued to act as secretary and manager, not only from his second election to the expiration of his first year, but afterwards, that is, from the 8th of September, 1895, to the 21st of November, 1895, and was paid his salary of $2000 ·per annum monthly at the rate of $166.66 until the latter date. At a special meeting of the board of directors, held on the 21st of November, 1895, the appellee tendered his resignation as secretary and manager, which was accepted, as we infer.  Appellee still retained his place as stockholder and director, attending all the meetings of the board of directors except one held in February, 1896.  At the same meeting at which appellee's resignation as secretary and manager was tendered and accepted as aforesaid, the board of directors by resolution fixed the salary of appellee at $166.66 per month, to be paid monthly, and it was further provided that in the event the board of directors should become dissatisfied at any time with the services of appellee, each party agreed on a notice of thirty days for terminating the contract.  We understand by this that each party might terminate the contract by giving the required notice of thirty days.  But appellee seems to contend that the contract could only be terminated by the appellant becoming dissatisfied with his services, and giving him thirty days' notice.  That is the very letter of the contract, it is true, but its spirit was doubtless such that either party could terminate it on the same conditions.  However that may be, the appellee

accepted and acted upon the new contract, and was paid $166.66 monthly according to the terms thereof until in June following—the time of the regular meeting, when the office of general manager was abolished, and the employment of appellee ended, without any expression of dissatisfaction with his services, except such as may be implied in the desire to avoid the further expense of the office. Due notice of the termination of his employment appears to have been given appellee according to the new contract, before his services were dispensed with, and he then quit the company's employment accordingly. The arrangement or new contract to pay for services, made on November, 21, 1895, appears to have been a new contract, and seems to have been a substitute for the old one in some important particulars.

At the close of the first year, no dissatisfaction with the services of the appellee was expressed or shown in any way. On the contrary, he had just before that time been re-elected to his place for another year, and had entered upon the performance of his duties for the second year. Apparently, his management had been a success. Under this state of things, the contingency had not happened in which the company was bound to repurchase the stock. It was doubtless thought at that time that the stock was no burden to appellee, as the business had prospered, and he was still occupying his same position. In fact, after the lapse of the first year, with everything satisfactory, that part of the contract relating to the repurchase of the stock was *functus officio*, according to its very terms.

The contract did not require the company to repurchase the stock, in case a repurchase should be made, at the same price appellee gave for it—75 cents on the dollar for the $7000, amounting to the sum of $5250. There is no proof that such was the market value of the stock at the institution of this suit. If the cause was maintainable at all, it was for the then market value, and not for a mere refunding of the amount paid originally by appellee for the stock with interest, as was fixed in the decree. But it makes no difference, in our view of the case; the proof is not such as to justify a decree of specific performance in any sense, and the decree of the chancellor is therefore reversed, and the complaint is dismissed for want of equity.